UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Bremer Trust, N.A.,                                          Civ. No. 15-3002 (MJD/BRT)

          Plaintiff,

v.                                                                     **REPORT AND RECOMMENDATION**

Quality Ingredients Corporation,

          Defendant.

Thomas H. Boyd, Esq., Winthrop & Weinstine, PA, counsel for Plaintiff.

Kathryn N. Hibbard, Esq., Lawrence M. Shapiro, Esq., and Mark L. Johnson, Esq., Greene Espel PLLP; and Kevin R. Coan, Esq., Mark T. Berhow, Esq., and Margaret Ann Santos, Esq., Hinshaw & Culbertson LLP, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

       This matter is before the Court on Defendant Quality Ingredients Corporation's ("QIC's") Motion to Dismiss or Stay Proceedings (Doc. No. 11). QIC argues that this Court does not have subject-matter jurisdiction over this case because Plaintiff Bremer Trust, N.A. ("Bremer"), as the non-discretionary, directed trustee of QIC's Employee Stock Ownership Plan, lacks standing to maintain this lawsuit. Alternatively, QIC requests that the Court dismiss this action without prejudice or stay the litigation pending the decision of the Special Litigation Committee. A hearing was held on the motion on September 29, 2015. The matter has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and D. Minn. LR 72.1 and 72.2.

(Doc. No. 17.) For the reasons set forth below, this Court recommends denying Defendant's motion in its entirety.

## BACKGROUND

QIC is a Minnesota corporation with a majority of its shares owned by its employees through an Employee Stock Ownership Plan and Trust (the "Plan"). (Doc. No. 8, Am. Compl. ¶¶ 1, 5, 9.) In September 2010, QIC appointed Bremer (replacing BNC National Bank) as the Plan's successor trustee under a Trust Agreement.[1] (*Id.* ¶ 6.) Bremer's role is to "serve as a non-discretionary, directed trustee of the Trust Fund as described in ERISA Section 403(a)." (Day Decl. ¶ 1, Ex. 1, § 1.3(c).) Bremer "is responsible for maintaining custody of the assets held in the Trust Fund, for investing those assets as directed by an Authorized Person, and for making distributions to payees as directed by the Plan Administrator[.]"[2] (*Id.*) "The Trustee [*i.e.*, Bremer] may refuse to exercise any power that it believes, in its sole judgment, will cause it to become a 'fiduciary' or 'plan administrator' as defined under ERISA." (*Id.*)

In August 2013, QIC sold certain facilities in Marshfield, Wisconsin. (Am. Compl. ¶ 8.) At the time of the sale, the Plan was the sole shareholder of QIC, owning all of its issued and outstanding shares of stock. (*Id.* ¶ 9.) Under ERISA, the asset sale required a

---

[1] The original Trust Agreement was entitled "Agreement Appointing BNC National Banks as the Directed Trustee of the Quality Ingredients Corporation Employee Stock Ownership Plan." (Doc. No. 14, Decl. of Isabelle Day ("Day Decl.") ¶ 1, Ex. 1.)

[2] The Plan defines "Plan Administrator" as "the person(s) designated pursuant to Section 13.01 of the Plan. The Plan Administrator is a 'named fiduciary' within the meaning of ERISA section 402(a)(2)." (Doc. No. 20, Decl. of Kevin Weise in Opp'n of Def.'s Motion to Dismiss or Stay Proceedings ("Weise Decl.") ¶ 3, Ex. A at 10.)

vote by the Plan participants. In preparation for that vote, QIC prepared an Information Statement for the Plan participants to explain the transaction and its impact on them. (*Id.* ¶ 10.) According to the Information Statement, "[a]ll of the participants in the [Plan] will share in the value created by the Proposed Sale. This value will be reflected in the updated valuations of all QIC shares . . . ." (Weise Decl. ¶ 6, Ex. B at 11.) The Information Statement also stated that the "portion of the Escrow Fund returned to QIC will be portioned (based on share ownership at the time of the Sale) between terminated . . . and remaining QIC employees. For terminated employees, it is expected to be distributed in cash within 60 days." (*Id.* at 12.) The Plan participants voted in favor of the asset sale. (Am. Compl. ¶ 11.) As part of the terms of the sale, QIC received a portion of the sale proceeds upon closing and approximately $4.7 million was placed in an escrow fund to be released to QIC in two installments—the first $1.9 million nine months after the closing and the remaining balance eighteen months after closing. (*Id.* ¶¶ 12–13.) Eight months after the sale, but before QIC received any of the proceeds from escrow, QIC's chief executive officer, Isabelle Day, exercised certain incentive stock options, became a minority shareholder in QIC, and asserted an interest in a proportional share of any distributions made by QIC. (*Id.* ¶¶ 18–19.)

On September 19, 2014, QIC's Board of Directors—comprised of Day, Robert Parmelee, and Bruce Boyea—held a special meeting to discuss "the first release of escrow proceeds from the August 2013 Marshfield sale." (Day Decl. ¶ 3, Ex. 3.) Day recused herself from the discussion. (*Id.*) After further discussion at a second meeting regarding "the release of the escrow proceeds related to the Marshfield sale," Parmelee

and Boyea approved "the escrow funds be released to the [Plan]."[3] (Day Decl. ¶ 2, Ex. 2.) Thereafter, QIC released the first installment payment from the escrow (totaling $1.9 million) to the Plan for distribution to the Plan participants, without any distribution to Day. (Am. Compl. ¶¶ 28–29.)

On March 1, 2015, the remaining $2.8 million installment payment from the Marshfield sale was released from escrow to QIC, but QIC has not (to this date) transferred the funds to Bremer for distribution to the Plan participants. (*Id.* ¶¶ 31, 35.) Since that time, Bremer has made repeated requests to have the second release of escrow funds transferred to it for distribution to Plan participants. (*Id.* ¶ 39.) Bremer contends that both installments released to QIC from the escrow fund were to be contributed and transferred to Bremer consistent with the decision made by Parmelee and Boyea during the September 2014 board meeting, and that all funds from the Marshfield sale were to be distributed to the QIC Plan members in proportion to their ownership interests at the time of the sale.[4] (*Id.* ¶¶ 14, 28.) QIC, on the other hand, contends that the decision made in that meeting was limited to only the first installment payment. QIC further maintains that

---

[3]   Prior to this decision, Parmelee sought a legal opinion from counsel, and counsel for QIC determined that "100% of the escrow distribution should go to the [Plan]." (Am. Compl. ¶ 23; Day Decl. ¶ 3, Ex. 3.) Parmelee also sought the opinion of an accounting firm, which concurred with the legal opinion and advised that all escrow proceeds should be released to the Plan. (Am. Compl. ¶ 24; Day Decl. ¶ 3, Ex. 3.)

[4]   After March 1, 2015, both Parmelee and Boyea resigned, leaving Day as the sole remaining director. (*Id.* ¶¶ 43–44.) On July 1, 2015, Day appointed herself to replace Parmelee as Chair of the Board of the Corporation, and then appointed Delbert Dawley, QIC's Director of Finance and a subordinate to Day, to serve as a Director. (Am. Compl. ¶¶ 45–46.)

it is not apparent from the meeting minutes whether Parmelee and Boyea properly considered all of the issues presented by the competing claims, including what impact their decision might have on the status of QIC as an S-corporation.[5]

Because of these issues, and the concerns that QIC has for its corporate status, its current board (*i.e.*, Day and Dawley) established a Special Litigation Committee ("SLC") "to review and analyze the claims of Bremer and Day, with due regard to any legal obligations and tax consequences related to or resulting from those claims," and to decide whether QIC properly distributed the 2014 escrow proceeds and how QIC should distribute the 2015 escrow proceeds. (Am. Compl. ¶¶ 48–49; Day Decl. ¶ 4, Ex. 4.) The board appointed retired Judge John W. Borg to serve as the sole committee member. (Am. Compl. ¶ 47; Day Decl. ¶ 4, Ex. 4.) QIC agrees that any SLC decision made in this regard is binding on QIC. (Day Decl. ¶ 4, Ex. 4.)

---

[5] QIC is an S-corporation, which entitles it to certain favorable tax treatment. QIC points out that as an S-corporation, it cannot have more than one class of shareholders with differing entitlements to shareholder distributions. *See* 26 U.S.C. § 1361(b)(1)(D) (defining an S-corporation as "a domestic corporation . . . which does not . . . have more than 1 class of stock."). If QIC does, as a matter of structure or practice, have more than one class of shareholders, then it could lose its S-corporation status. *See Id.* § 1361(d)(2)(A) (stating that S-corporation status can be involuntarily terminated when the corporation "ceases to be a small business corporation" with one class of stock); *see also Minton v. Comm'r of Internal Revenue*, 562 F.3d 730, 732 (5th Cir. 2009) ("If an S-corp issues a second class of stock, it ceases to fit the definition of a small business corporation, and its S-corp status is automatically terminated.").

## DISCUSSION

### I.   Standard of Review

"Subject matter jurisdiction . . . is a threshold requirement which must be assured in every federal case." *Turner v. Armontrout*, 922 F.2d 492, 493 (8th Cir. 1991). QIC argues that the Court should dismiss the Amended Complaint with prejudice under Federal Rule of Civil Procedure 12(b)(1) because Bremer lacks standing to maintain this action. "[I]f a plaintiff lacks standing, [a] district court has no subject matter jurisdiction. Therefore, a standing argument implicates Rule 12(b)(1)." *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002) (citation omitted). When a party brings a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the burden of establishing jurisdiction rests on the party invoking federal jurisdiction. *V S Ltd. P'ship v. Dep't of Hous. and Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000) ("The burden of proving subject matter jurisdiction falls on the plaintiff."). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety.").

On a Rule 12(b)(1) motion challenging subject-matter jurisdiction, the court "has authority to consider matters outside the pleadings." *Osborn v. United States*, 918 F.2d 724, 728 n.4 (8th Cir. 1990). Unlike the standards of Federal Rule of Civil Procedure 56, which apply when matters outside the pleadings are considered on a Rule 12(b)(6) motion for failure to state a claim, a court addressing a Rule 12(b)(1) motion is "free to

weigh the evidence and satisfy itself as to the existence of its power to hear the case." *P.G. v. Ramsey County*, 141 F. Supp. 2d 1220, 1230 (D. Minn. 2001) (quoting *Osborn*, 918 F.2d at 730). "In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Osborn*, 918 F.2d at 730 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

## II.     Analysis

To bring a civil action under ERISA, a plaintiff must have statutory standing. *Hastings v. Wilson*, 516 F.3d 1055, 1060 (8th Cir. 2008). Under ERISA, a participant, beneficiary, *or fiduciary* may bring a civil action to enjoin any practice that violates any provision of ERISA or the terms of the Plan. 29 U.S.C. § 1132(a)(3); *see also Hastings*, 516 F.3d at 1060. ERISA defines a person as a fiduciary "with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan . . . ." 29 U.S.C. § 1002(21)(A)(i), (iii).

The parties dispute whether Bremer is a fiduciary under ERISA. QIC argues that Bremer does not have standing to bring this suit because the limiting language in the Trust Agreement between the parties states that Bremer (*i.e.*, the Trustee) "has no duty or authority to require any contributions or transfers to be made under the Plan to the Trustee . . . ." (Day Decl. ¶ 1, Ex. 1, Trust Agreement, Art. 2.2.) Because the Trust Agreement says Bremer has no such duty or authority, QIC contends that Bremer has no

"discretionary authority or discretionary control respecting management of the plan or its assets" and therefore is not a fiduciary for purposes of the relief sought in the Amended Complaint.[6] (Doc. No. 13, Def.'s Mem. in Supp. of Mot. to Dismiss or Stay ("Def.'s Mem.")10 (citing *Trigon Ins. Co. v. Columbia Naples Capital, LLC*, 235 F. Supp. 2d 495, 503–04 (E.D. Va. 2002)).) According to QIC, Bremer cannot bring suit to force it to make any contributions under the Plan. Bremer disagrees, asserting that it has standing under ERISA to bring claims against QIC to remedy QIC's breached fiduciary obligations and to recover amounts due and owing to the Plan. This Court agrees with Bremer.

"[T]he term fiduciary is to be broadly construed." *Olson v. E.F. Hutton & Co.*, 957 F.2d 622, 625 (8th Cir. 1992) (quotations omitted). Contrary to QIC's argument, while "discretion" is the "benchmark for fiduciary status under ERISA," *Maniace v. Commerce Bank of Kansas City*, 40 F.3d 264, 267 (8th Cir. 1994), the Eighth Circuit has determined that ERISA "imposes fiduciary duties only if one exercises *discretionary* authority or control over plan *management*, but imposes those duties *whenever* one deals with plan *assets*." *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994) (emphasis in original); *see also Groska v. N. States Power Co. Pension Plan*, No. CIV 05-114 (JNE/FLN), 2007 WL 2791119, at *5 (D. Minn. Sept. 24, 2007) ("Under ERISA, a

---

[6] QIC also argues that the Trust Agreement gives Bremer the power to commence litigation in only two circumstances: (1) at the direction of QIC (*see* Trust Agreement, Art. 4.1(r)); and (2) with respect to any matter pertaining to the interpretation of the Trust Agreement or the administration of the Trust Fund (*see* Trust Agreement, Art. 4.2(i)). QIC contends neither of these circumstances is present.

fiduciary is one who exercises discretionary control over some aspect of the management or administration of an ERISA plan, *or any control whatsoever over plan assets*.") (emphasis added). "The distinction between one who deals with plan management versus one who deals with plan assets is not accidental; rather, it reflects the high standard of care trust law imposes upon those who handle money or other assets on behalf of another." *Minn. Power & Affiliated Cos. Ret. Plan A v. Capital Guardian Trust Co.*, Civ. No. 07-3866 (ADM/RLE), 2008 WL 2891057, at *3 (D. Minn. July 22, 2008) (quotations omitted). Therefore, a directed trustee who is "authorized and directed to hold, manage, invest, and account for all plan assets," retains "the trustee's fiduciary duty when handling plan assets," even where, as here,[7] the trustee can only act at the direction of another entity like a committee or plan administrator. *FirsTier*, 16 F.3d at 911.[8]

---

[7] Bremer "is responsible for maintaining custody of the assets held in the Trust Fund, for investing those assets as directed by an Authorized Person, and for making distributions to payees as directed by the Plan Administrator[.]" (Day Decl. ¶ 1, Ex. 1, § 1.3(c).)

[8] As the Court in *Maniace* explained:

> In *FirsTier* we faced a situation in which the trustee bank had general fiduciary responsibility for management of all plan assets, but was subject to direction of the plan sponsor to make loans to participants out of plan assets. Loans were in fact made at the sponsor's direction and, following the company's bankruptcy, the bank was sued by borrowing participants for breach of fiduciary duty. The bank defended by claiming to be a directed trustee with no attendant fiduciary responsibilities. Trustee responsibilities in that case were significant, with the bank being "authorized and directed to hold, manage, invest, and account for *all* plan assets." *Id.* at 911 (emphasis added). Under those circumstances we concluded that the ERISA section defining duties of directed trustees "modifies, but . . . does not eliminate the trustee's fiduciary duty when handling plan assets." *Id.* We

(Footnote Continued on Next Page)

Here, it is undisputed that Bremer deals with plan assets. Bremer "is responsible for maintaining custody of the assets held in the Trust Fund, for investing those assets as directed by an Authorized Person, and for making distributions to payees as directed by the Plan Administrator[.]" (Day Decl. ¶ 1, Ex. 1, § 1.3(c).) The Information Statement prepared for the Marshfield transaction confirms that Bremer "is responsible for the management and control of the assets of the [Plan]." (Weise Decl. ¶ 6, Ex. B at 10.) Because Bremer controls and manages trust assets, and specifically controls and manages the trust assets from the Marshfield sale, Bremer has fiduciary obligations to the Plan participants and standing to bring this lawsuit. *See FirsTier Bank*, 16 F.3d at 911 (stating fiduciary obligations are imposed on a trustee "*whenever* one deals with plan *assets*") (emphasis in original). For this reason alone, Defendant's motion to dismiss should be denied. This Court will, however, address QIC's additional arguments regarding standing.

"Fiduciary status under [ERISA] is not an all-or-nothing concept . . . . A court must ask whether a person is a fiduciary with respect to the particular activity in question." *Walker v. Nat'l City Bank of Minneapolis*, 18 F.3d 630, 633–34 (8th Cir. 1994) (quotations omitted). QIC argues that the "particular activity in question" is whether the 2015 escrow installment funds should be transferred to Bremer. QIC contends Bremer

---

(Footnote Continued from Previous Page)
    found the "prudent man standard of care" remained despite the bank's status as a directed trustee. *Id.*
40 F.3d at 268.

does not have standing in this litigation because the 2015 funds have remained under QIC's control and have not been transferred to Bremer, meaning that the funds are not "Trust Assets" that would carry with them a fiduciary obligation. Under the Trust Agreement, "Trust Assets" are defined as "all of the money, securities, debt instruments, and other assets held in the Trust Fund." (Day Decl. ¶ 1, Ex. 1 at §1.1(p).) And the "Trust Fund" includes "all of the money, securities, debt instruments, and other assets *which may be transferred*, assigned, and delivered to the Trustee from time to time to be held in trust hereunder . . . *in accordance with* the terms and provisions of this Agreement and *proper directions received by the Trustee*." (*Id.* at §1.1(q) (emphasis added).)

First, QIC's interpretation of "the particular activity in question" is too narrow. As Bremer has alleged, the "particular activity in question" is the decision made by QIC with respect to all funds received from the Marshfield transaction. It is undisputed that the first escrow installment that flowed from the Marshfield transaction, which was transferred to Bremer, was trust assets managed by Bremer. Although Bremer does not specifically assert any claims in its Amended Complaint that relate to the 2014 installment payment, QIC has instructed the SLC to look back at the decision made with respect to the first escrow installment to determine whether some of it should have been paid to Day. Bremer would certainly have standing to pursue claims that relate to the first installment. It would not make sense for Bremer to have fiduciary status over one installment but not another installment that flows from the same sale, and such splitting of hairs would not be consistent with the Eighth Circuit's ruling in *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994) (considering important the trustee being "authorized and directed to

11

hold, manage, invest, and account for all plan assets," not the specific authority given for each specific loan).

Second, based on both the board decision that "the escrow funds be released to the Plan" and the Information Statement, which said that the "portion of the Escrow Fund returned to QIC will be portioned (based on share ownership at the time of the Sale) between terminated . . . and remaining QIC employees" and "Plan participants will recognize value from the Proposed Sale in three increments," the $2.8 million installment payment from the Marshfield sale that was released from escrow to QIC arguably[9] could be considered assets of the "Trust Fund" over which Bremer has a fiduciary role because it could be considered an "asset which may be transferred . . . in accordance with . . . proper directions received by the Trustee." The fact that there is an interpretation disagreement about whether the second installment payment involves assets of the Trust Fund is enough to confer standing on Bremer to bring suit because, pursuant to Section 4.2(i) of the Trust Agreement, Bremer has the authority to bring a legal action "with respect to any matter pertaining to the interpretation of this Agreement or the administration of the Trust Fund . . . ." (Day Decl. ¶ 1, Ex. 1.)

Furthermore, the Information Statement acknowledges that "[t]he actions of the [Plan] Trustee with respect to voting the stock held by the [Plan] are governed by the fiduciary duties and requirements of ERISA."(Weise Decl. ¶ 6, Ex. B at 14.) If Bremer

---

[9] The Court need not resolve this potentially dispositive argument now to determine the standing issue.

has fiduciary duties with respect to voting the participant stock in relation to the Marshfield sale, then Bremer would have standing as a fiduciary to bring an action against another plan fiduciary for breaching obligations that result from that vote.[10] *See Maniace*, 40 F.3d at 268 (stating that when a fiduciary duty is allocated by a ERISA plan to the plan sponsor [*i.e.*, QIC here] rather than the directed trustee, the directed trustee retains a fiduciary duty to make reasonable efforts to remedy a breach of fiduciary duty by the plan sponsor if the trustee is aware of the breach); *see also FirsTier Bank*, 16 F.3d at 911 (stating that a directed trustee "is not relieved of its fiduciary duties . . . to attempt to remedy known breaches of duty by other fiduciaries" (citing 29 U.S.C. § 1105(a) (obligating fiduciaries to make "reasonable efforts under the circumstances to remedy [a known] breach" by other fiduciaries with respect to the same plan))).

Finally, even if the second escrow installment were not construed as a trust asset yet, the Plan specifically provides Bremer with a "duty to make efforts to collect such sums as may appear to be due (except contributions hereunder) . . . ." (Weise Decl. ¶ 3, Ex. A at Art. 11.04(c).) Bremer has provided an unrebutted explanation of why the payment of money escrowed from the Marshfield asset sale is not a contribution of QIC corporate profits and therefore does not fall within the stated exception. (Doc. No. 19, Bremer's Mem. of Law in Opp'n of Def.'s Mot to Dismiss or Stay Proceedings 17, n. 3 (citing Weise Decl. ¶ 17).) And Bremer certainly has a prima facie reason for believing that the second installment payment appears to be due based on the Information

---

[10]   This Court's conclusion on standing in no way rules on what QIC's obligations were after the vote, or whether QIC's actions or inactions violated ERISA.

Statement, the advice of counsel during the board's consideration of the transfer of the first escrow payment, the opinions of the external accounting firm, and the board's decision to transfer the escrow funds in September 2014. Based on all of the above, this Court concludes that Bremer has standing to bring the instant action and, thus, that it has subject-matter jurisdiction over this case.

Alternatively, QIC requests that this Court either dismiss or stay this action pending the decision of the SLC. QIC points out that "[u]nder Minnesota law, when a board properly delegates its authority, courts will defer to the SLC's decision under the business judgment rule." (Def.'s Mem. 12 (quoting *In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*, No. 06-CV-1216, 2007 WL 803048, at *2 (D. Minn. Mar. 14, 2007).) Here, QIC has asked the SLC to investigate, review, and analyze the legal rights and remedies that QIC has regarding the competing claims of Bremer and QIC's minority shareholder to both the first and second distributions. QIC maintains that if the SLC determines that Bremer is entitled to 100% of the escrowed proceeds from the Marshfield sale and directs QIC to transfer the remaining escrow proceeds to Bremer, the instant action may become moot.

This Court recommends denying QIC's motion to dismiss or stay the proceedings. First, it is questionable whether the SLC would be entitled to deference with respect to a 2015 escrow proceeds decision under the business judgment rule because its appointment in that respect may be outside that which is authorized by Minnesota law.  Minn. Stat. § 302A.241, subd. 1 authorizes the appointment of an SLC "to consider legal rights or remedies of the corporation and whether those rights and remedies should be pursued."

Here, although the document appointing the SLC says it appoints the SLC "to investigate and consider the legal rights and remedies of the Corporation as related to the competing claims its shareholders have made with respect to the 2014 Escrow Proceeds and 2015 Escrow Proceeds," it appears with respect to the 2015 escrow installment the SLC has been appointed to determine only whether QIC is obligated to transfer the 2015 escrow proceeds to Bremer for distribution to Plan participants, not to decide whether QIC should pursue legal claims against another with respect to those particular proceeds. (Day Decl. ¶ 4, Ex. 4 ("The Board hereby delegates to the Special Litigation Committee full and complete authority to review and analyze the claims of Bremer and Day, with due regard to any legal obligations and tax consequences related to or resulting from those claims, and to decide the Corporation's rights and remedies with respect to the following questions: . . . . Based on the applicable law and facts, how the Corporation should distribute the 2015 Escrow Proceeds between Bremer and Day.") Any decision in this regard made by the SLC would not be binding on this Court.

More importantly, however, litigation over the facts underlying the present suit would continue regardless of how the SLC decides. If the SLC determines that a portion of the proceeds should go to Day, and not to Bremer, then the current claims by Bremer against QIC would continue. If the SLC determines that all of the proceeds should be transferred to Bremer for distribution, and even if QIC agrees to transfer the proceeds, there is still the potential that Day, individually, would intervene to assert a claim in this litigation based on her status as a current minority shareholder in QIC. Accordingly, the delay that would be brought about with a stay is not justified under the circumstances.

## RECOMMENDATION

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Quality Ingredients Corporation's ("QIC's") Motion to Dismiss or Stay Proceedings (Doc. No. 11) be **DENIED**.

Date: October 30, 2015

*s/ Becky R. Thorson*
BECKY R. THORSON
Unites States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in D. Minn. LR 72.2(c).

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.